696 A.2d 788

FRANCIS J. HARTMAN, PLAINTIFF, JEFFREY A. MINTZ AND CHARLES H. RYAN, PLAINTIFF INTERVENORS, v. KEVIN M. COVERT, CHAIRMAN OF THE BURLINGTON DEMOCRATIC COMMITTEE, R. LEE PFISTE O'TOOLE AND ALICE FURIA, DEFENDANTS.

Superior Court of New Jersey
Law Division
Burlington County

January 17, 1997.

328

*Francis J. Hartman,* pro se.

*Jeffrey A. Mintz,* pro se, and for plaintiff intervenor Gray Hamans.

*Charles H. Ryn,* pro se.

*John Harrington,* for defendant Kevin Covert.

*William John Kearns, Jr., (Kearns, Vassallo, Guest & Kearns),* for defendant R. Lee Pfister O'Toole.

*R. Louis Gallagher, (Kessler, Tutek, Gladfelter, Sattin & Gallagher),* for defendant Alice Furia.

*Gregory Romano,* Deputy Attorney General, *Peter G. Verniero,* Attorney General of New Jersey for the State of New Jersey amicus curiae.

WELLS, A.J.S.C.

This action began on verified complaint and order to show cause on June 11, 1996, by Francis Hartman as a candidate for the Chair

position of the Burlington County Democratic Committee (Committee) against Kevin Covert, the incumbent Chairman of the Committee.[1] Plaintiff asserted various causes of action in connection with what was, at the time it was filed, the upcoming election of Chair and Vice–Chair of the Committee, alleging violations of Title 19, the bylaws of the Committee and its traditional practices and procedures in connection with election of officers. The court briefly stayed the election and briefs were ordered.

On the return day, June 21, 1996, I ordered the election to proceed subject to a final ruling on the merits. Ultimately, two women, Lee O'Toole and Alice Furia, won election as Chair and Vice–Chair by a small margin of votes. Plaintiff submitted the issues on the briefs previously filed and the arguments heard on the return day. This opinion expands upon a letter opinion dated August 2, 1996 which I affirmed the results of the election.

The issues fell into two main categories: (1) those critical of the Chairman, who was not, himself, a candidate for re-election, and the election process itself; and, (2) those questioning whether plaintiffs announced rival for the position of Chair, a woman, could be elected with a candidate for Vice–Chair, also a woman, in derogation of the apparent dictate of N.J.S.A. 19:5–3.

The first category of issues has been abandoned. But, what remained was a decision whether or not two women can serve as the Chair and Vice–Chair of the Burlington County Democratic Committee, since, indeed, it was that result which obtained as the result of the election. The Court approached this ruling with considerable circumspection and an absolute regard for longstanding legislative enactments such as the challenged passage from Title 19. In this respect, the issue, I recognize, is more far-

---

[1] Plaintiff was later joined by intervenors Jeffrey Mintz, then-candidate for the position of Committeeman, Gary Haman, as candidate for the position of Vice–Chair of the Committee, and Charles Ryan, as candidate for the Chair position. Defendant was also joined by intervenors R. Lee Pfister O'Toole and Alice Furia, the persons ultimately elected to the positions of Chair and Vice–Chair, respectively.

reaching than the issue of ballot position for the primary election of Governors and U.S. Senators under N.J.S.A. 19:23–26.1 as was decided in *Lautenberg v. Kelly*, 280 *N.J.Super.* 76, 654 *A.2d* 510 (Law Div.1994) wherein *Eu v. San Francisco County Democratic Central Committee*, 489 *U.S.* 214, 109 *S.Ct.* 1013, 103 *L.Ed.2d* 271 (1989). also played such a compelling role. Doubtless, as a result of the statute, the practice of requiring the leadership of the various county political party committees to be filled by persons of opposite genders has become thoroughly imbedded in the daily warp and woof of the political process in New Jersey. Indeed, one can easily speculate that but for a provision such as this, the place of women in the political process would not be as well established as it is now. For these reasons alone, as well as the respect due the vintage enactment under scrutiny here, it should not be lightly set aside. In addition, one is called upon to look at the court's August decision as a glass half full: i.e., as opening up 100% of the positions in top party leadership to both genders, rather than as abolishing women's guarantee to at least 50% of those positions.

■ Nevertheless, whether the glass is viewed as half full or half empty, the Court confirms its prior ruling that the July 1996 election for Chair and Vice Chair of the Burlington County Democratic Party was valid by holding N.J.S.A. 19:5–3 unconstitutional insofar as it mandates the election of officers of a county committee based on gender. This holding is predicated on the United States Supreme Court's holding in *Eu v. San Francisco County Democratic Central Committee*, 489 *U.S.* 214, 109 *S.Ct.* 1013, 103 *L.Ed.2d* 271 (1989). In my opinion, the State simply does not now have, if it ever did, such a compelling interest in the internal affairs of the County Committees of the political parties as to warrant legislating the gender of candidates for leadership positions of those parties.

N.J.S.A. 19:5–3 requires that the county committees of political parties consist of one male and one female member from each unit of representation in the county. The male receiving the most votes among the male candidates and the female receiving the

most votes among the female candidates are to be declared elected at the primary for the general election. *Id.,* N.J.S.A. 19:5–3 not only provides that the Chair and Vice–Chair be of the opposite sex, but that each pair of County Committee people be of the opposite sex. *Id.*

This statute is in conflict with the mandates of the United States Supreme Court based on its holding in the *Eu* case. Therefore, it is worthwhile to delve into the rationale of the United States Supreme Court in the *Eu* opinion in a bit of detail. The plaintiffs in *Eu* challenged certain sections of the California Elections Code, specifically those which forbade the official governing bodies of political parties to endorse or oppose candidates in primary elections and in non-partisan school, county, and municipal elections, dictated the organization and composition of parties' governing bodies, limited the term of office for a party's state central committee chair and required that the chair rotate between residents of northern and southern California. *Eu, supra,* 489 *U.S.* at 219, 109 *S.Ct.* at 1018.

The Court of Appeals for the Ninth Circuit held the challenged provisions of the California Code to be unconstitutional, as California's regulation of internal party affairs "burdens the parties' rights to govern themselves as they think best." *Eu, supra,* 489 *U.S.* at 222, 109 *S.Ct.* at 1019 (citing *San Francisco Cty. Democratic Cent. Com. v. Eu,* 826 *F.*2d 814, 827 (1987)). The Court of Appeals found that California's interference with the parties and their members' First Amendment rights was not justified by a compelling state interest, for a state has a legitimate interest "in orderly elections, not orderly parties." *Id.*

The Supreme Court stated that in determining the constitutionality of a state election law, first one must examine whether or not the law burdens rights protected by the First and Fourteenth Amendments to the Constitution. *Id.* at 1019 (citing *Tashjian v. Republican Party of Connecticut,* 479 *U.S.* 208, 214, 107 *S.Ct.* 544, 548, 93 *L.Ed.*2d 514 (1986). *Anderson v. Celebrezze,* 460 *U.S.* 780, 789, 103 *S.Ct.* 1564, 75 *L.Ed.*2d 547 (1983). If it is

established that the challenged law burdens the rights of political parties and their members, then in order for the law to withstand constitutional scrutiny, the State must prove that the law advances a compelling state interest. *Id.* (citing *Tashjian,* 479 *U.S.* at 217, 222, 107 *S.Ct.* at 550, 552); *Illinois Bd. of Elections v. Socialist Workers Party,* 440 *U.S.* 173, 184, 99 *S.Ct.* 983, 990, 59 *L.Ed.*2d 230 (1979)) Further, the law must be narrowly tailored to serve that interest. *Id.* (citing *Illinois Bd. of Elections,* 440 *U.S.* at 185, 99 *S.Ct.* at 990–91).

The Supreme Court ultimately upheld the decision and reasoning of the Court of Appeals, rendering the challenged provisions of the California Election Code invalid. *Eu, supra,* 489 *U.S.* at 233, 109 *S.Ct.* at 1025. Proceeding through a constitutional analysis of the laws at issue, the Court first found the challenged portions of the laws to directly implicate the associational rights of political parties and their members. *Id.* at 230, 109 *S.Ct.* at 1024. In support of that assessment, the Court stated that "(a) political party's 'determination . . . of the structure which best allows it to pursue its political goals, is protected by the Constitution,' " *Id.* at 229, 109 *S.Ct.* at 1023 (citing *Tashjian v. Republican Party of Connecticut,* 479 *U.S.* 208, 217, 107 *S.Ct.* 544, 550, 93 *L.Ed.*2d 514 (1986)) and that freedom of association "encompasses a political party's decisions out the identity of, and the process for, electing its leaders." *Eu, supra,* 489 *U.S.* at 229, 109 *S.Ct.* at 1023. Regarding the California laws' restrictions on the organization and composition of local governing bodies, specifically the limits on the term of office for state central committee chair and the requirement that the chair rotate between the residents of northern and southern California, the Court found that through these laws the State of California prevents the political parties from governing themselves with the structure that they think is best. *Id.* at 230, 109 *S.Ct.* at 1024. The restrictions enumerated under the California Code were found by the Court to limit a political party's discretion in "how to organize itself, conduct its affairs, and select its leaders." *Id.* In *Eu* the Court found the associational rights

at stake to be even stronger than those it previously credited[2] since the rights involved party members seeking to associate with one another in freely choosing their party leaders. *Id.*

As it was determined that the challenged portions of the law did burden the rights protected by the First and Fourteenth Amendments, the Court next moved to an inquiry as to whether the challenged laws served a compelling state interest. *Id.* The Court acknowledged that states have a legitimate interest in preserving the integrity of the election process. *Id.* (citing *Rosario v. Rockefeller,* 410 *U.S.* 752, 761, 93 *S.Ct.* 1245, 1251–52, 36 *L.Ed.*2d 1 (1973)) and that states may enact laws that interfere with a party's internal affairs when necessary to ensure the fairness of the election process. *Id.* (citing *Storer v. Brown,* 415 *U.S.* 724, 730, 94 *S.Ct.* 1274, 1279, 39 *L.Ed.*2d 714 (1974)). Specifically, the Court recognized that states may impose restrictions that promote the integrity of primary elections, but in those situations the infringement on the associational rights of the parties and their members was the indirect consequence of laws necessary to the successful completion of a party's external responsibilities in ensuring the order and fairness of elections. *Id.* at 231–32, 109 *S.Ct.* at 1024–25. However, the restrictions imposed by the California laws involved direct regulation of a party's leaders. *Id.* The Court stated that "a State cannot justify regulating a party's internal affairs without showing that such regulation is necessary to ensure an election that is orderly and fair." *Id.* at 233, 109 *S.Ct.* at 1025. The State of California was not found to have made such a showing, thus the Court ruled that the challenged laws could not be upheld. *Id.*

Defendants in the instant matter argue that N.J.S.A. 19:5–3 burdens the rights of the members of the Burlington County Democratic Committee to the extent that the statute imposes

---

[2] In the *Tashjian* case, the Court found that a party's right to free association embraces a right to allow registered voters who are not party members to vote in the party's primary.

gender based restrictions on the rights of the members of the Committee to select their officers. This statute would prevent defendants from the exercise of their First Amendment association rights to join together in a political party and to govern that party free of the interference of the State.

N.J.S.A. 19:5–3 restricts the positions of chair and vice-chair to persons of opposite genders. As in the *Eu* case, this statute limits New Jersey political parties' discretion in how to organize themselves and select their leaders, thus burdening the associational rights of the parties and their members. In addition, as in *Eu* the associational rights at stake are particularly strong as they implicate the right of an entirely voluntary group of persons who are seeking to associate with one another for specific political goals and objectives central to the democratic process.

We therefore move to an analysis of whether the law serves a compelling state interest. The only interest asserted by the plaintiff in support of the statute and the way he seeks to distinguish the instant matter from the United States Supreme Court's holding in *Eu* appears to be the assurance and protection of equal representation of the two genders in terms of political party leadership. Plaintiffs assert that the intent behind the passage of N.J.S.A. 19:5–3 must be considered when determining the fate of the statute. While it is apparent that the statute's likely intent at the time of its passage was the remedial goal of assuring equal representation in top political party leadership of the two genders, that purpose has been largely subsumed by the pronouncements of both federal and state law striking down gender-based discrimination. See, e.g., *Frank v. Ivy Club et als.,* 120 *N.J.* 73, 576 *A.*2d 241 (1990); *Fuchilla v. Layman,* 109 *N.J.* 319, 334, 537 *A.*2d 652 (1988); *Roberts v. U.S. Jaycees,* 468 *U.S.* 609, 104 *S.Ct.* 3244, 82 *L.Ed.*2d 462 (1984); New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5–1 to –42.

The first insertion of a gender reference into N.J.S.A. 19:5–3 was in 1955 when an amendment was inserted providing for the election of a "vice-chairlady." N.J.S.A. 19:5–3, L.1955, c. 236, p.

904, sec. 1. In 1964 the provision was further amended to delete the requirements of a male chair and a female vice-chair, and instead simply required the chair and vice-chair positions be filled by persons of opposite gender. N.J.S.A. 19:5–3, L.1964, c. 23, sec. 1.

The statute has remained despite the fact that gender discrimination is contrary to the legislative policy of the State of New Jersey. See, *Frank*, 120 *N.J.* at 110, 576 *A*.2d 241. "The eradication of 'the cancer of discrimination' has long been one of our State's highest priorities." *Id.* (citing *Dixon v. Rutgers, The State University of N.J.*, 110 *N.J.* 432, 451, 541 *A*.2d 1046 (1988)). In fact, while N.J.S.A. 19:5–3 was once enacted to protect women, it can now be argued that it serves to bar them from at least 50 per cent of the seats available for top leadership. So while at one time the law may have been viewed as salutary to equalize opportunity between the genders in the political forum and to encourage women's involvement in politics, such a law now has an effect opposite to that of its original design. In addition, and even more compelling, the plaintiff in this matter has made no showing that the law or the intent behind the law is presently necessary to ensure an orderly and fair electoral process, as required by *Eu.*

*5 To sum up, first, N.J.S.A. 19:5–3 burdens the associational rights of the members of political parties in New Jersey in that it mandates county political committees to have one woman and one man in the positions of Chair and Vice–Chair of the committees, preventing the occupancy of the positions by two men or by two women, as was the case with the Burlington County Democratic Committee. Second, no showing has been made of a compelling state interest sufficient to sustain the burdens of N.J.S.A. 19:5–3. The requirement of one man and one woman in the positions does not serve to ensure an "orderly and fair" election process. Clearly, taking N.J.S.A. 19:5–3, the Supreme Court's pronouncement in *Eu* and the policy in this State against discrimination together, N.J.S.A. 19:5–3 is rendered unconstitutional and invalid.